# APPENDIX.

## NOTES OF CASES NOT OTHERWISE REPORTED.

### Richards v. Burden et. al.

Partnership: dissolution of: conflicting testimony considered in determining the rights and liabilities of various parties.

#### ON REHEARING.

1. Practice in supreme court: re-hearing: question to be tried. A re-hearing of a cause by the Supreme Court is a new trial regardless of the former opinion of the court; and the essential question is not whether the former opinion shall be adhered to, but whether the judgment of the court below shall be affirmed.

2. ———: ———: court equally divided. Hence, when the court on the rehearing of a cause is equally divided as to whether the judgment of the lower court should be affirmed, that judgment stands affirmed by operation of law, and that regardless of the fact that the court in its first opinion may have thought that the judgment should be reversed. Beck, J., *dissenting*.

*Appeal from Dubuque District Court.*

#### Thursday, April 21.

This action was commenced on the 18th day of September, 1869, for the dissolution of the partnership existing between the plaintiff and the defendant, George Burden, the distribution of the partnership assets, the appointment of a receiver, and an injunction to prevent the defendants, Eliza A. Burden, and Richard Babbage, from disposing of certain firm property placed in their possession by the defendant, George Burden. The defendant, Eliza A. Burden, filed an answer and cross bill, asking that her account for a large amount of money advanced to the firm of Richards & Burden be stated and allowed. The defendants, George and Eliza A. Burden, also filed a cross-bill asking the enforcement of a certain contract entered into, as alleged, between the plaintiff and the defendants, George and Eliza A. Burden, for the conveyance of certain lands in Mitchell and Chickasaw counties. On the

18th day of September, 1869, John Hodgdon was appointed receiver of the effects of the partnership, and an injunction was granted as prayed. On the 27th of November, 1869, by consent of parties, the cause was referred to D. C. Cram, Esq., to take proofs and report on the issues and state an account. On the 12th day of July, 1876, the referee filed his report, containing a very full and exhaustive presentation of the facts, and embracing seventy distinct findings. The plaintiff and each of the defendants, George and Eliza A. Burden, excepted to certain portions of the report. At the November term, 1877, of the District Court, an interlocutory decree was entered sustaining, in part, the exceptions of each of the parties. The cause was again referred to the same referee for supplemental report upon certain matters indicated in the interlocutory decree. On the 6th day of March, 1878, the referee filed his supplemental report, upon which, on the 20th day of July, 1878, the District Court entered final decree. This decree renders judgment in favor of Eliza A. Burden against the firm of Richards & Burden for $6,276.41. It is further adjudged that the balance due plaintiff from the firm of Richards & Burden, January 1, 1878, was $26,778.20. It is further adjudged that the firm of Richards & Burden recover from the defendant, George Burden, the sum of $20,939.07. It is further ordered that the firm of Richards & Burden be dissolved. No relief was granted against the defendant, Richard Babbage. The plaintiff and each of the defendants, George and Eliza A. Burden, appeal. The facts necessary to an understanding of the various points ruled are stated in connection with the discussion of the points respectively.

*Griffith & Knight*, for the plaintiff.

*George Crane* and *Robinson & Lacy*, for the defendants.

DAY, J.—This action was commenced on the 18th day of September, 1869. For nearly nine years it was pending in the court below. On the 29th day of July, 1878, final decree was entered in the court below, which was satisfactory to neither party. On the 20th day of September, 1878, the defendants perfected their appeal. On the 11th day of October, 1878, the plaintiff perfected an appeal. The cause involved the partnership business of the plaintiff and the defendant, George Burden, for a period of about fifteen years, and questions of a collateral nature connected with the partnership. The parties differ, almost *toto cœlo*, and the controversy has engendered a bitterness of feeling greatly to be deplored. In view of the many points in controversy, the great mass of the testimony, its unusually conflicting character, and the pertinacity with which the views of the respective parties are urged, it is scarcely to be hoped that we will be able to make a disposition of the case more satisfactory to the parties than that made by the referee and the court below. Where questions of fact are to be determined upon conflicting evidence, it rarely happens that a conclusion can be reached which will meet with universal approval from parties indifferent as to the result, much less from parties deeply interested upon opposite sides. Oftentimes the tribunal which has to determine can only say that the conclusion adopted is more probably correct than its opposite, and is forced to admit that against the

view reached objections may be urged which it is not possible to answer. We freely admit that we have found ourselves in this condition as to some of the questions of fact involved in this case. And yet, if no conclusion may be reached and acted upon, against which an unanswerable objection exists, individuals and courts must leave many of the most important business controversies undetermined. It is a matter of universal experience that opposite views may be maintained by unanswerable arguments. In such cases the only reasonable course is to adopt the more probable views.

In our consideration of the various questions at issue between the parties, it will not be practicable, and if practicable, it would not be profitable, to discuss all the testimony directly or remotely bearing upon them. We shall attempt no more than an allusion to the prominent features of the testimony which control our judgment. Where the evidence comes in direct conflict, and we are unable to determine a preponderance either way, we shall adopt the conclusion which in view of the whole case seems to us the more reasonable. When this test is wanting, and the evidence seems to be *in equilibrio*, we shall decide adversely to the party on whom rests the burden of proof. We now proceed to a consideration of the various questions in controversy between the parties, in an order somewhat different from that pursued by counsel,

*I. As to the claim of Mrs. Burden being usurious.*

During the years 1854 and 1855. Mrs. Burden, then Mrs. Holmes, placed in the hands of the plaintiff as a member of the firms to which he belonged, as shown by the evidence and found by the referee, $10,224.72. An important question of difference between the parties. is as to the contract under which the money was received. The plaintiff insists that the money was received as a loan, under an usurious agreement for the payment of twenty per cent per annum interest. Mrs. Burden insists that the money was furnished to the firms as her agent to be employed by them in time entries, they to account for one-half of the profits, and to have the other half as compensation for their services. The referee and the court below sustained the view of the defendant, Mrs. Burden, as to this question, and held that the agreement was not usurious. On the 30th day of May, 1856, the plaintiff rendered to Mrs. Eliza A. Holmes, now Mrs. Burden. a statement of account. Appended to this account he wrote as follows: "Eliza A. Holmes has paid to me the above amounts in all, and she should receive them and twenty per cent., in all from T. R. & D. and T. R. & B., from date of being received to this date, less her debit account and one-half house expenses." The plaintiff places great reliance upon this memorandum as sustaining his view of the case. In our opinion it is equally consistent with the view of the defendant, Mrs. Burden. The evidence shows that in the time entry business forty per cent was exacted of the party for whom the entry was made. If he paid for the entry, forty per cent profit was realized upon the investment. At the time this memorandum was made it was supposed by the parties that, if the entry was forfeited and the firm had to keep the land, the land was worth as much as the original investment and forty per cent thereon. So that, in either event, the firm supposed that investments made were yielding a profit of forty per cent.

It is therefore perfectly consistent with the claim of Mrs. Burden that the plaintiff should say, when rendering his account, that Mrs. Holmes should receive the various sums advanced, and twenty per cent from date of being received. On the 4th of July, 1856, the plaintiff rendered another account in which the sums due are designated as principal and interest. The fact that the plaintiff, in estimating the amount due Mrs. Burden, designated the amount above the principal sum received as interest, is a circumstance entitled to only slight consideration, in view of the other testimony in the case. The plaintiff's understanding of the manner in which this money was to be employed is derived from a letter which he wrote to the defendant, Mrs. Burden, on the 25th day of April, 1854, just after he had received the second installment of money. In this letter he says: "I have invested all your funds, $2,000, at twenty per cent, without any charge for gold or drafts. I took the deeds in my name for convenience, and have executed a deed to you, so that the title is in you if I should be taken away. I will send you a description of the lands by and by when I have more time. The reason of my doing this is, that while you are just as safe, it saves you a great deal of trouble in constantly making deeds in Rockford, and sending to settlers here when they pay up. You understand that you have now $3,000 invested in improved lands in Iowa, at $1.05 per acre, most, indeed I believe all, being for one year from the time the investment was made. All this draws twenty per cent. So that your income from this source is $600 per year, and, as soon as the money begins to be paid in, you can invest at the same rate, both principal and interest. I have no doubt but that you can do this, or I can for you, for five years yet at least. If we are economical, in that time you can double your money, besides living, and I now think I can make mine ten times as big. I had invested Melinda's at 40 per cent. The more I see of this business and of the men who have been in it for ten or fifteen years, the more confident I am that there is no chance for failure. Moreover, I say now, and you may keep the letter, that if you or Melinda lose anything by sending money here, or even fail of making as much as you possibly could in Illinois, I will make up the balance out of my own pocket." This letter is altogether inconsistent with the notion that the money was received as a loan to be repaid with interest.

The time location book of B. B. Richards, Taylor & Richards, and Taylor, Richards & David, contains the name of Eliza A. Holmes, opposite five distinct entries, in a column headed "names of cestui que trust, or person furnishing the money to make the location." This mode of keeping the books is inconsistent with the notion that the money of Mrs. Holmes was simply loaned to the firm, to be repaid with interest. After the formation of the firm of Taylor, Richards & Burden, the mode of keeping the books was changed, as shown by the evidence, for convenience in keeping, but it does not appear that Mrs. Holmes had any knowledge of that fact. Mrs. Burden testifies as follows: "The agreement between the plaintiff and me in regard to the first money advanced by me to him was that it was to be used in time entries through Mr. Taylor, as I understood it. The terms were that the money was to be used in time entries and I was to receive one-half of the profits (which were usually forty per cent) and the firm or the plaintiff, as my agent, the other one-half, for his services. I advanced money aftewards

never as a loan, but always for time entries. It was agreed that the title to the land entered should be taken in the name of plaintiff, or some member of the firm, as my agent or trustee. I talked with Mr. Taylor in regard to such investments. Twenty per cent from the profits was to be paid to me. I never loaned any money to Taylor, Richards & David, and never heard it mentioned till here in the court by the plaintiff. They received my money as my trustees or agents, to invest in land on time for settlers, and agreed to pay me from the profits, twenty per cent. I talked with Mr. Taylor and the plaintiff about it. I did not loan any money to Taylor, Richards & Burden, until the close of the year 1858, or January, 1859. I advanced some other money to Taylor, Richards & Burden, and credits from Taylor, Richards & David, which were to be used in entering land on time, as long as there were time entries to be made. My agreement with Taylor, Richards & Burden was exactly the same as my agreement with Taylor, Richards & David, as I understood it." John W. Taylor, a member of the firm of Taylor & Richards, Taylor, Richards & David and Taylor, Richards and Burden, testifies as follows: "We received money from Mrs. Burden, to be invested for her in time locations. She was to have twenty per cent on the money out of the profits, and the firm investing it was to have all the profits above twenty per cent for their services."

Upon the other hand, the plaintiff testified as follows: "My agreement with Mrs. Burden, then Mrs. Holmes, from the first was that she should receive twenty per cent interest on all the money that came into my hands, without loss of time, until the same should be repaid. The lands conveyed to her, or which she held through me as trustee, were for her security, and only that. The money was to be repaid absolutely to her with interest at twenty per cent per annum." There is some evidence tending to corroborate this testimony of the plaintiff, but more corroboratory of the evidence of Mrs. Burden. Without noticing the evidence more in detail upon this branch of the case, we deem it sufficient to say that, after a careful examination of all the evidence bearing upon this question, we are well satisfied with the finding of the referee upon this point, and we concur with the referee and the court below in the conclusion that the money was not received under an usurious agreement.

*II.   As to the amount of Mrs. Burden's credit against the firm of Richards & Burden.*

The evidence shows, and the referee found, that the money originally furnished by Mrs. Burden to the plaintiff, to be accounted for by the firms to which he belonged, was $10,224.72. Upon this branch of the case, the testimony as shown by the abstract is as follows: John W. Taylor testified: "At the close of 1858 the accounts of the different members of the firm were made up, and each member of the firm, and others who had advanced money for the time locations, were credited with the twenty per cent as if realized profits. Many of the time locations were not then paid up, and it was uncertain whether they would be. The value of the land was uncertain, but the firm had confidence that it would ultimately prove a good investment and yield at least the profits credited to those advancing money. It was understood that the firm should keep the land and pay the profits as credited

upon the books. Taylor, Richards & Burden received Mrs. Burden's money upon the same conditions that the firms before them did, but they did not set apart to her specific locations and keep an account with them. We preferred to assume the profits were made and credit accordingly. It was impossible to determine the exact profits on time locations, but we thought that justice to Mrs. Burden and to others furnishing money required us to assume that profits enough were made in one way and another to entitle them to twenty per cent."

The defendant, George Burden, testified as follows: "It was understood between Mrs. Burden, John W. Taylor and Richards & Burden, in regard to Mrs. Burden's money and interest in time entries at the close of 1858, that she should be settled with upon the basis of twenty per cent credits for the money advanced by her, less her debits, and that Richards & Burden should retain her money as a loan, and that she should have no interest in the lands."

The plaintiff testified as follows: "The simple truth is, that on December 31, 1858, Mrs. Burden received credit of twenty per cent per annum for the preceding year, making her gross credit on that day $10,320.47. That credit has stood there from that time to this without change, without agreement of any kind, but simply left there, by consent of all parties, except of course the pretended agreement of May 25th 1869." Upon this evidence the referee found that the balance of $10,220.47 must be held as an account stated of the amount due Mrs. Burden, January 1, 1859. As against the firm we think the finding of the referee is correct. We understand the plaintiff to object to this statement only upon the ground that the money was received under an usurious contract, and that the firm is liable only for the principal sum. It is claimed that, if the balance of January 1, 1859, was usurious, making it or calling it an account stated does not purge it of usurious complication. This is true. But if, as we have found, the money was not received under an usurious contract, and the firm dealt with the money in such a manner that it cannot tell what profits were realized from the money of Mrs. Burden, then Mrs. Burden should be allowed to accept and enforce against the firm whatever arrangement the firm substituted for the original agreement, rendered incapable of enforcement by the manner in which the firm conducted the business. Mrs. Burden accepts the statement as correct, and concedes that since the first day of January 1859, her money has remained with the firm of Richards & Burden as a loan simply. The amount thus stated as due January, 1859, $10,320.47, should be made the basis of the settlement of the accounts between the parties.

III. *As to the rate of interest which Mrs. Burden should be allowed since January 1, 1859.*

Mrs. Burden concedes that the amount of her money in the hands of Richards & Burden, on the first day of January, 1859, remained with them thereafter as a loan. She claims that the firm agreed to allow her thereon interest at the rate of ten per cent. payable annually. The plaintiff claims that no agreement as to interest was made. The evidence upon this question leaves it in very great uncertainty. The referee allowed Mrs. Burden on her account against the firm from January 1st, 1869, interest at the rate of seven

per cent per annum, with annual rests, and held that the firm at no time made any other obligatory contract with her as to interest on her open account. Taking the evidence all together, we think it is not shown that prior to some time in 1862 the firm had any agreement with Mrs. Burden as to the rate of interest to be allowed. It appears from a preponderance of the evidence that the defendant, George Burden, subsequently to his marriage with Mrs. Burden, executed to her, in 1862, a written agreement on behalf of the firm for the payment of interest at the rate of ten per cent per annum, payable annually. It appears also that, some time in 1865, this written agreement was surrendered, and the defendant, George Burden, executed another written agreement for the payment of ten per cent interest, covering the amounts embraced in the first agreement, and others subsequently advanced. Both of these written agreements are lost.

It appears from the evidence that the plaintiff had no knowledge of the execution of these agreements on behalf of the firm. It is true that, under ordinary circumstances, one partner has authority to settle a debt of the firm and to execute an agreement to pay thereon any legal rate of interest. But the relations of these parties are so peculiar that we think this principle should not apply. At the time these contracts were executed, the defendant, George Burden, was the husband of the creditor of the firm, Mrs. Burden. He was directly interested in swelling the amount of the claim against the firm. In making this agreement he did not occupy the usual position of a partner solicitous only to guard the interests and protect the rights of the firm. He had an interest adverse to the interests of the firm. If the defendant, George Burden, had been himself the creditor of the firm, and he had executed to himself on behalf of the firm an agreement to pay upon an open account ten per cent per annum interest, papable annually, it would hardly be insisted that such agreement could be enforced. But his interest is in fact scarcely less direct and actual than if he were himself the creditor. We think that, conceding these written agreements to have been executed at the times stated in the testimony of the defendants, they cannot be enforced against the firm. Interest at a greater rate than six per cent per annum can be allowed only when the parties agree in writing for the payment of such rate. Code, § 2077; *Thrift v. Redman*, 13 Iowa, 25; *Myers v. Smith*, 15 Id., 181; *Lommen v. Tobiason*, 52 Iowa, 665. The referee and the court below allowed Mrs. Burden seven per cent per annum with yearly rests. It is probable that the finding of the referee upon this point is based upon inventories of the firm made in 1861, 1862 and 1865, in which the sums due Mrs. Burden seem to be computed at seven per cent. We have no doubt from the evidence that the firm expected to pay, and Mrs. Burden to receive, interest at the rate of seven per cent, payable annually. Still we do not think the inventories establish a written agreement for the payment of interest at that rate. They were made for the purpose of obtaining an approximate estimate as to the condition of the firm. We think that, since January 1, 1859, Mrs. Burden should be allowed on her credits against the firm interest at the rate of six per cent, and that upon her debits she should be charged at the same rate, both to be computed in the manner set out in the twentieth finding of the referee.

*IV. As to the $4,000 furnished by Mrs. Burden, but not credited to her on the books of the firm.*

The evidence shows that of the $10,224.72, originally furnished by Mrs. Burden to the plaintiff, the following items: $2,500, April 26, 1855; $600, May 28, 1855; $600, July 7, 1855, and $300, August 11, 1855, were not entered upon the books of the respective firms to the credit of Mrs. Burden, and they form no part of the $10,320.47, standing to her credit on the first day of January, 1859. About the 30th day of May, 1856, the plaintiff executed to Mrs. Burden, then Mrs. Holmes, on account of these several items, aggregating $4,000, his promissory note for $5,000. The note has been destroyed. The plaintiff insists that the note bore an usurious interest, twenty per cent. Mrs. Burden claims that the note bore but ten per cent. As to the rate of interest upon the note the testimony is in direct conflict. The fact of the execution of the note being admitted, the presumption of the law is that it was in accordance with, rather than in violation of, the law. The burden of proof is therefore upon the plaintiff who asserts that the note was usurious. The evidence appears to be *in equilibrio*, and hence this point must be determined adversely to the party on whom rests the burden of proof. It follows that the referee correctly found that this note bore interest at the rate of ten per cent. It is claimed that this sum of $4,000 was entered upon the books of Taylor, Richards & Burden to the credit of Richards; that in his accounts with the firm he was allowed twenty per cent thereon, and that, as it was a trust fund misapplied, he should account to Mrs. Burden for the profits actually realized thereon. We think this position would be correct if Richards actually obtained a credit upon the books for this amount. Upon this question the testimony is conflicting. Richards testifies that he used it in personal transactions, and did not obtain credit upon the books of the firm for that amount. We have examined all the evidence bearing upon this question with great care, and while we concede that the point is not clear of doubt, yet we do not feel that the evidence warrants a finding that Richards obtained credit upon the books for this sum. The mode adopted by the referee of charging the plaintiff with the several sums making up this $4,000, as set forth in the 13th finding of fact, is correct. The plaintiff is properly chargable with six per cent interest until the note was executed, and with ten per cent thereafter, until liquidated by the amounts chargeable to Mrs. Burden for household expenses.

*V. As to the contract between the plaintiff and Mrs. Burden respecting household expenses.*

The plaintiff is a brother of the defendant, Mrs. Burden. In 1854 the plaintiff was a widower, with a son three and one-half years old. The defendant, Mrs. Burden, then Mrs. Holmes, was a widow, residing at Rockford, Illinois, having a younger sister, Melinda Richards, living with her. It was arranged between the plaintiff and Mrs. Holmes that these four should constitute a family at Dubuque. Pursuant to this arrangement, Mrs. Holmes removed with her household effects to Dubuque, and she and the plaintiff commenced keeping house on the 25th day of December, 1854. In January, 1857, Melinda Richards married Mr. Hervey and removed to Des Moines. During the years 1856 and 1857, Mr. Burden, who was then a suitor of Mrs.

Holmes, became a guest of the family, and remained about one year. In the fall of 1857, Mrs. Hervey and her husband returned to the family, where four children were born to them, three of whom survived. Mrs. Hervey and her three children continued members of this household as long as it existed, and her husband about seven years of the time. In November, 1857, the father and mother of the plaintiff and of Mrs. Holmes became members of the family, and so continued during its existence. With the father and mother came three small children, one an infant of Mrs. Waldo, a deceased sister of plaintiff and Mrs. Holmes. Two aunts of the plaintiff and Mrs. Holmes during the period of their housekeeping visited them, and spent about one year each. In November, 1861, the defendant, George Burden, married Mrs. Holmes, and became a member of the household. During all this period Mrs. Burden was recognized as the mistress of the family. Invitations to parties and to social entertainments were issued in her name, and she entertained her friends at pleasure. In this manner these parties resided together until the first of October, 1865. During this period neither of the defendants contributed anything to the household expenses, with the exception of $87.50, contributed by Mrs. Holmes to the payment of rent. From the first day of October, 1865, until June, 1866, when the defendants removed to their own house, an account of family expenses was kept, and they were paid out of the income of the firm.

The plaintiff claims that it was agreed between himself and Mrs. Holmes that each should bear one-half of the household expenses. Mrs. Holmes concedes that such agreement was originally made, but insists that it was conditioned upon the family continuing as constituted when the agreement was made, and upon her continuing to receive twenty per cent per annum profits upon her money in plaintiff's hands; and that the agreement was abandoned in 1856. The evidence upon this branch of the case is very conflicting. We feel, however, constrained to hold that it does not establish the conditions nor the abandonment claimed. All of the persons who became members of the family, or who were entertained as guests, were as nearly related to Mrs. Holmes as to the plaintiff. We are satisfied from all the evidence that she derived as much comfort, and received as many advantages, from the joint house keeping arrangement, as did the plaintiff. We see nothing unjust or inequitable in requiring her to bear one-half the expense of securing for herself, her needy sister, her aged parents, her sister's orphaned children, and her husband, a comfortable home, in which for eleven years she was permitted to preside as undisputed mistress, and to entertain her friends at pleasure, without question or restraint.

*VI. As to the amount which should be charged to Mrs. Burden for household expenses.*

The referee found that the household expenses, one-half of which should be charged to Mrs. Burden, were, from December 25, 1854, to December 25, 1862, $1,312 per year, and from December 25, 1862, to October 1st, 1864, $2,000 per year. The court modifies this finding so far as to fix the amount of expenses at $2,000 per year for the whole period from December 25, 1854, to October 1, 1865. The referee based his finding principally upon a statement, made by the plaintiff, of household expenses for five and

one-half years.  We have carefully examined the evidence upon this point, and we think it sustains the finding of the referee.  The expense account should remain as fixed by the referee.  Interest should be computed and the amounts applied upon the $4,000 and interest, as indicated in the fourteenth finding of the referee.

*VII.  As to whether the plaintiff is entitled to credit upon the firm books for the amount of the uncles and aunts accounts.*

This is one of the most important and difficult questions at issue between these parties.  The referee very pertinently says upon this branch of the case, that "the conflict in the evidence is appalling."  We have with great care examined the entire evidence bearing upon this question.  It is useless to attempt to reconcile or harmonize the testimony.  The conflict is utter and hopeless.  The referee, in his report, allowed the plaintiff to have the benefit of a credit for these accounts.  The court set aside this finding of the referee, and struck out these sums from the plaintiff's credit, thus reducing his balance on the first day of January, 1856, in the sum of $7,470.70.

Prior to the formation of the partnership of Taylor, Richards & Burden, certain uncles and aunts of plaintiff, residing in New York, sent the plaintiff money to be used in his discretion, for which he issued his individual receipts or notes, promising to pay them twenty per cent per annum.  This money was credited to the uncles and aunts on the books of Taylor, Richards & David, and was used by them in their time entry business.  After the firm of Taylor, Richards & Burden was formed, these credits to the "uncles and aunts" were transferred to the books of Taylor, Richards & Burden.  As the books then stood, the firm of Taylor, Richards & Burden appeared to be the debtor of the "uncles and aunts," although the money was furnished to B. B. Richards, and the "uncles and aunts" as we think the evidence shows, looked to him for payment.  The credits so stood until October, 1858, when the plaintiff caused the "uncles and aunts" to be charged upon the books of Taylor, Richards & Burden with the amount appearing to their credit upon the books, and took credit himself on the books of the firm for the same amount.  At the time of this transaction no payment was made to the "uncles and aunts."  When these transfers were made to the plaintiff, so far as the firm was concerned, the debt to the "uncles and aunts" became the individual debts of the plaintiff, as they were at the beginning.  What was the purpose in making this transfer we are unable to determine from the evidence.  It is claimed by the defendant, George Burden, that this transaction was fraudulent as to the firm, in that it would enable Richards to settle with the "uncles and aunts" for less than the sum actually due, and charge the firm with the whole amount advanced and interest.  But we are satisfied that no such fraudulent purpose could have been contemplated at the time the transfer was made, for the firm then believed itself solvent, and expected to pay all its liabilities in full.  It seems to us, therefore, that if the "uncles and aunts" were willing to regard the plaintiff as sole debtor, it could make no real difference to the firm whether the amount of these accounts stood upon the books of the firm to the credit of the plaintiff, or to the credit of the "uncles and aunts."  If the plaintiff had in fact paid the "uncles and aunts," no real injury would have been done to any one by

the transfer of accounts upon the books. But, as we have said, the "uncles and aunts" were not paid. The defendant, George Burden, was informed of the transfer soon after it was made. He testifies that he frequently protested against the change, and that the plaintiff promised to place the accounts back to the credit of "uncles and aunts" all of which the plaintiff most vigorously and emphatically denies.

Each member of the firm of Taylor, Richards & Burden was to furnish all the money he could, and was to have twenty per cent per annum on his money out of the profits of the business, and all profits after allowing this were to be divided equally between the partners. This arrangement was made under the supposition that the profits of the business would be at least forty per cent per annum upon the money employed. The money furnished by each partner was placed to his credit. The firm assuming and believing that profits had been made in excess of the twenty per cent agreed to be paid each partner, on the 31st day of December 1856, 1857 and 1858, entered upon the books of the firm to each partner a credit of twenty per cent interest upon the amounts by each member advanced to the firm. As a result of this mode of procedure, on the first day of January, 1859, Burden had a general balance to his credit on the books of the firm of $27,772.93, and Richards had a general balance of $18,862.60. Of the balance in favor of Burden, $10,607.16 was the assumed annual profits of twenty per cent; and of the balance in favor of Richards, $7,068.14, was the assumed annual profits of twenty per cent. It thus appears that the assumed profit in favor of Burden exceeded the assumed profit in favor of Richards in the sum of $6,539.02. The parties agreed that the balances existing on the first day of January, 1859, should draw interest at the rate of ten per cent. From the outlook in 1860 it began to appear that the parties had not in fact realized profits. As the defendant, George Burden, had advanced much more money than the plaintiff, it is apparent that, to credit up both parties with profits which had not been realized, would tend to swell, in a proportionate degree, the defendants' credit against the firm, and to place the plaintiff at a proportionate disadvantage. In 1860, the plaintiff began to complain of the twenty per cent which had been annually added to the amounts advanced by each partner in line of profits which had not then been realized. As a result of negotiations between the parties, on the 8th day of May, 1860, they entered into a contract of which the following is a copy:

"Memorandum of agreement between Benjamin B. Richards and George Burden, of Dubuque, Iowa:

"Said Richards agrees to put in his share of the lands of Taylor, Richards & David, as per list accompanying this memorandum, as assets of the firm of Taylor, Richards & Burden, at three dollars per acre, amounting to 3,378 acres, and being one-third of 10, 134 acres, he to have a credit of $10,134 for the same, said lands to be taken subject to all tax liens, but in case the title to any of these lands should prove defective in said Taylor, Richards & David, and the lands should be lost through such defect, said Richards to make good said Burden for his loss through such defect. The credits of said Richards with the said T., R. & David, and his interest in any other assets than lands, and his liabilities as a member of such firm of T., R. & David, not to be affected by this transfer of his interest in said lands. In consider-

ation that said·Richards does hereby transfer his undivided third interest in and to the lands aforesaid, and dose make and constitute them assets of the firm of Taylor, Richards & Burden, so that said Burden shall have the same interest in said lands that said Richards has, said Burden agrees to allow said Richards a credit of $10,134, being $3 per acre for said lands, on the books of said T., R. & Burden; said Burden also agrees that the interest of himself and said Richards shall draw interest only at the rate of 7 per cent. per annum from and after the first day of January, 1859, instead of 10 per cent, as heretofore agreed upon between said T., R. & Burden. Said Burden also agrees to consider the debt due to the aunts and uncle Billings, in Saratoga county, N. Y., and for which said Richards has given his individual notes as the debt of said Taylor, R. & Burden, and to jointly, with said Richards, secure and pay said debt as he and said Richards shall be able."

The value of these lands, $10,134, just about equalized the plaintiff's and George Burdens' credits against the firm, allowing the plaintiff to retain credit for the amount of the "uncles and aunts" accounts. As we have before said, the transfer of these accounts to the plaintiff would have wronged no one if the "uncles and aunts" had been in fact paid. But in this agreement Burden agrees to consider the debt due to the aunts and uncle Billings, in Saratoga county, N. Y., as the debt of said Taylor, Richards & Burden, and to jointly, with said Richards, secure and pay said debt. Jonas S. Billings, one of the uncles to whom Richards was indebted, did not reside in Saratoga county, and was not embraced in this agreement. From a careful examination of all the testimony bearing upon this branch of the case, we feel reasonably well satisfied that this contract was entered into upon the basis of the credits as they stood upon the books, embracing the credit to the plaintiff of the "uncles and aunts" accounts, and that this credit cannot be disturbed, without ignoring this agreement. It is true that, upon this supposition, the plaintiff receives credit for the whole of a debt, a part of which the defendant Burden agreed to pay. But as an offset to this the defendant Burden was permitted to retain a credit against the firm for $3,539.02, on account of profits which were not realized, which greatly exceeds the part of the debt to the "uncles and aunts" which he agreed to pay. If his agreement to pay a part of this debt was contingent upon the plaintiff's credits being reduced by the amount of the "uncles and aunts" accounts, it is unaccountable that the agreement should have been made without any stipulation for the reduction of the plaintiff's credits. The construction which we place upon the agreement does no wrong to the defendant, Burden. It simply offsets his credit for profits which had not been realized, by his obligation to pay a debt for which the plaintiff was allowed sole credit. The contract made the credits of the two parties almost equal on the 8th day of May, 1860, and placed them, as nearly as practicable, upon an equal footing. We think the referee properly found that the plaintiff's credits should not be disturbed, and that the court erred in striking from the plaintiff's credits the amounts of the "uncles and aunts" accounts.

*VIII. As to whether the Chickasaw and Mitchell county land contract is binding between plaintiff and Mrs. Burden, and her right to enforce the same.*

On the 9th day of January, 1868, the plaintiff and the defendant, George Burden, executed a written contract, as follows: "It is agreed between George Burden, Eliza A. Burden and B. B. Richards as follows: That George Burden and Eliza A. Burden take from the firm of Richards & Burden as follows: All the land the said firm has in Mitchell and Chickasaw counties, at $4.50 per acre, which includes sw 3, 95, 12, which is a tax title, and the land of Stimpson, when they, R. & B., have obtained title from Stimpson. These lands to be charged to Eliza A. and Genrge Burden as of January 1, 1868. They, R. and B., are to guarantee all titles except sw 3, 95, 12. Also, the said firm are to let Eliza A. Burden have eight thousand dollars of their bills receivable, George Burden to select one-half, and B. B. Richards one-half, of such bills receivable, or the firm may elect to give five thousand dollars in such bills receivable in the mentioned, and in that case, the said firm shall give their note for three thousand dollars to Eliza A. Burden, payable in six months at seven per cent interest; if not paid at the expiration of said six months, the said note is to draw ten per cent until paid; interest payable annually. The amount of one-half of said lands to be charged to Eliza A. Burden in account with Richards & Burden, the other half to George Burden in same account."

Each of the defendants, in a cross petition, asks a specific performance of this contract, and that a conveyance to them of the lands referred to may be decreed. This contract was signed by B. B. Richards and George Burden on the 9th day of January, 1868. It was then placed in the firm safe, where it remained until about the last of March, 1869, when it was signed by Mrs. Burden. The evidence is utterly conflicting as to whether Mrs. Burden was present at the time the contract was signed by Richards & Burden. The referee has found from the evidence that she was not present. We do not deem it essential to a conclusion upon this branch of the case to determine this question. The evidence shows that, if Mrs. Burden was present, the contract was not then read over in her hearing. We cannot find from the evidence that she at that time expressed any affirmative assent to the contract, or did any act which would bind her to the terms of the agreement. Nor can we find from the evidence that at any time before the last of March, 1869, when she signed the agreement, she did any act which would have estopped her to deny that the agreement was binding upon her. So far as we can discover from the evidence, at no time before about the last of March, 1869, when Mrs. Burden signed the agreement, could the plaintiff have enforced the contract against Mrs. Burden. Up to that time the agreement was wanting in mutuality, and, if not binding upon Mrs. Burden, it could not have been enforced against Richards. We think the evidence shows that before Mrs. Burden signed the agreement she was informed that the plaintiff insisted that it was obtained from him by fraud, and that he did not intend to carry out its provisions. Before the contract was signed by Mrs. Burden it was repudiated by the plaintiff, and hence as between these parties there was no *aggregatio mentium*, and no contract. For this reason,

and for others which might be suggested, we feel satisfied that Mrs. Burden is not entitled to have a specific performance of this contract.

*IX. As to whether the defendant, George Burden, is entitled to a specific performance of the Chickasaw and Mitchell county contract.*

The evidence shows that the contract in question was presented to the plaintiff just upon the eve of his departure to attend a session of the Iowa legislature. The plaintiff was in fact, as it appears, on his way to the depot, and called into the office only for a few moments, when the contract was presented for his signature. He hastily read over the contract, wrote in pencil upon the margin, "Wrong as to the Stimpson land,"and signed it. The Stimpson land is a part of the land covered by the agreement. The evidence shows that the defendant, George Burden, did not understand the nature of this marginal memorandum. As late as the latter part of March, 1869, when he showed the contract to his attorney, he was of opinion that the marginal memorandum was, "wrong as to the stamps on land," and he asked the opinion of his counsel as to whether the contract was sufficiently stamped. It thus appears that the parties did not assent to the same agreement. The defendant, George Burden, supposed he was procuring a contract for the conveyance of the "Stimpson land," and one which in every respect as to such land was right and binding. The plaintiff understood that he was reserving the Stimpson lands from the operation of the contract, or at least providing that in some respect as to these lands the contract was wrong. "There is no contract, unless the parties thereto assent; and they must assent to the same thing, in the same sense." 1 Parsons on Contracts, fifth edition, page 475, and note *a*. It is evident, we think, that the parties to this contract did not assent to the same thing in the same sense. That, of itself is a sufficient reason why the contract should not be specifically enforced.

There are other reasons why there should not be a specific performance of this contract. The defendant, George Burden, for many years had been the book-keeper of the firm. The plaintiff insists that George Burden procured the execution of this contract by falsely and fraudulently representing that the plaintiff was very largely indebted to Mrs. Burden and the firm, and that the agreement for the conveyance of this land was made for the purpose of paying off, in part, the plaintiff's indebtedness to Mrs. Burden, and equalizing . his credit with the firm. The defendant's counsel concede that Mr. Burden represented to the plaintiff that his account with the partnership was largely overdrawn, and insist that the representation was based upon the claim that the "uncles and aunts' "accounts, and $4,000 advanced by Mrs. Burden, should be taken from the plaintiff's credits. Counsel in this argument say: "There is no doubt that Mr. Burden insisted and represented that the plaintiff was largely overdrawn on their partnership account, and for that reason urged that these lands should be sold to himself and wife in part payment of such overdraft. It is also true that before the contract of January 9, 1868, Mr. Burden claimed that the "uncle's and aunts" accounts should be stricken from the plaintiff's credits, and that the $4,000 advanced by Mrs. Burden should be taken from plaintiff's account and credited up to her account. The defendants claim that this contract was to diminish the large balances

in their favor, as would be shown by a correction of the books in reference to the above items, and that plaintiff always conceded, till the open rupture, that said items were to be corrected or changed as claimed by defendants." And again: "The truth is that Mr. Burden did represent that plaintiff was overdrawn to the extent of twenty thousand dollars or more, and plaintiff believed this representation to be true and, knew at the time it was based upon the $4,000 item, and the striking out of the "uncles and aunts" account.

We have already determined that the $4,000 item did not constitute a part of plaintiff's credit on the books of the firm, and that the "uncles and aunts" accounts should not be stricken out of the plaintiff's credits. It follows, therefore, that, if the agreement to convey these lands was made, as claimed to offset credit, which plaintiff had upon the books, and to which he was not entitled, there has been a failure of consideration for this agreement, and for that reason no specific performance of it should be decreed.

There is another reason why specific performance of this contract should not be decreed, which to our minds is quite satisfactory. It is fully apparent from the testimony that the sole inducement for the making of the contract upon the part of the plaintiff was to bring up his credit against the firm, so that it would the more nearly equal the large balance which was supposed to exist in favor of the defendant, George Burden. About the first day of April, 1869, the defendant, George Burden, took possession of the assets of the firm to a very large amount, and on the 23rd day of July, 1869, he sold real estate of the firm, the title of which stood in his name, to the amount of $17,936.58, for which he is liable to account. As a result of this transaction and all the dealings of the parties, it is found by the final report of the referee and the decree of the court, that, after disallowing to the plaintiff credit for the "uncles and aunts" accounts, there was due the plaintiff from the firm of Richards & Burden, on the first day of January, 1878, the sum of $26,778.20. It was also found that the defendant, George Burden, was indebted to the firm at the same date, in the sum of $20,939.07. This includes charges to the defendant, George Burden, growing out of sales of the Chickasaw and Mitchell county lands, in the sum of $18,038.38. So that, independently of all debits on account of the Chickasaw and Mitchell county lands, the defendant, George Burden, was indebted to the firm in the sum of $2,900.69. If then we should now enforce a specific performance of this contract, we would transform what was intended as a mere arrangement for the equalization of the credits of the partners, into a mere contract for the sale of partnership property at much less than its actual value, and, having compelled a conveyance, we would be obliged to decree payment of the contract price. What was intended to be accomplished by this contract has already been effected through other means, and there is now neither necessity for, nor equity in, decreeing a specific performance of this agreement. For these reasons, and others which might be presented, we feel satisfied that specific performance of this contract should not be enforced.

*X. As to the amount of credit plaintiff should receive for the adjustment of J. L. Billings' account.*

J. S. Billings is one of the "uncles" whose account the plaintiff credited to himself, and of which, as between himself and the firm, he thereby as-

sumed the payment. J. S. Billings did not reside in Saratoga county, and Mr. Burden did not assume the payment of any part of the debt due him, in the contract of May 8, 1860.

The debt due J. S. Billings is included in the credits which the referee found the plaintiff entitled to on January 1, 1859, and is embraced in the $7,470.70, the amount of the "uncles and aunts" accounts, stricken out of plaintiff's credits by order of the court. As we find the plaintiff entitled to credit for the whole amount of the "uncles and aunts" accounts, it follows that he is entitled to no additional credit for the amount paid J. S. Billings. The court below allowed plaintiff the amount of a note which he executed in settlement with J. S. Billings, but this was upon the basis of disallowing credit for the "uncles and aunts" accounts.

*XI. As to whether the plaintiff should be charged for the money loaned to C. F. Billings.*

C. F. Billings, a son of J. S. Billings, and cousin of the plaintiff, borrowed of the firm of Taylor, Richards & Burden, August 25, 1857, $221, and September 25, 1857, $221.30. The defendant, George Burden, claims that the plaintiff guaranteed the payment of these sums. This the plaintiff denies, and testifies that the loan was made in the ordinary course of business upon collateral security. On the 31st day of December, 1857, the amount of these loans $442.30, was charged to the plaintiff. At the close of the year 1858, B. B. Richards caused himself to be credited with this amount, and J. S. Billings to be charged with it. The books were in this condition at the time the contract of May 8, 1860, was executed. As we have already said, this contract was made pursuant to, and in recognition of, the credits as they then stood upon the books. This credit has stood upon the books ever since the year 1858, without any protest or objection on the part of Burden, so far as the evidence shows. In view of all the evidence in connection with the contract of May 8, 1860, and the fact that the burden of proof is upon the defendant, we think the plaintiff should not be charged with this account.

*XII. As to plaintiff's credit on the books of Taylor, Richards & David.*

On the 31st day of December, 1856, there stood upon the firm books of Taylor, Richards & David, credits in favor of the several partners individually, as follows: in favor of John W. Taylor, $117.02, in favor of B. B. Richards, $961.43, and in favor of E. C. David, $1,921.55. The plaintiff claims that he is entitled to a credit on the books of the firm of Richards & Burden for this item, and interest thereon from December 31, 1856. The referee allowed this credit in finding number twenty-six, and the court overruled the defendant's exception to this finding. In the contract of May 8, 1860, the plaintiff put in his share of the lands of Taylor, Richards & David, as assets in the firm of Taylor, Richards & Burden, but he reserved all other interests in the assets of the firm of Taylor, Richards & David. This contract provides: "The credits of said Richards with the said Taylor, Richards & David, and his interest in any other assests than lands, and his liabilities as a member of such firm of Taylor, Richards & David, not to be affected by this transfer of his interest in said lands." On the 21st day of January, 1861, E. C. David

agreed to quit-claim to George Burden all his interest in the lands, notes, accounts and other assets of the firm of Taylor, Richards & David. On the 8th day of June, 1864, John W. Taylor entered into a contract with George Burden & B. B. Richards, in which he agreed to settle certain claims of the firm of Taylor, Richards & David, and to transfer and to convey to Burden & Richards all his right, title and interest in the assets, whether real or personal, of the late firm of Taylor & Richards, Taylor, Richards & David, Taylor, Richards & Burden, and Taylor, Bennett & Co. In this contract Richards & Burden agreed as follows: "In consideration of the above agreement, the said Burden & Richards hereby agree to assume all the liability of said Taylor for any of the debts or liabilities of said firms of Taylor & Richards, Taylor, Richards & David, Taylor, Richards & Burden, and Taylor, Bennett & Co., so far as the same appear in any of the books or in any of the accounts of said several firms, and as far as any claims have been made or presented to or known by said Richards or Burden, particularly excepting and reserving a pretended claim of Logan & Cook, by virtue of a mechanic's lien against house on corner of Bluff and Thirteenth streets, Dubuque."

It is upon this contract that the plaintiff mainly relies for the establishing of this claim against the firm of Richards & Burden.

It is conceded by counsel that the firm of Taylor, Richards & David was solvent. They had partnership assets sufficient to pay off all the claims of the individual members of the partnership against the firm. The condition of this firm was such that there was no occasion for a member of the firm, who was a creditor, to resort to another member of the firm for satisfaction of the balance due him. In the situation of the firm and the condition of the accounts, Taylor was not, as an individual, outside of his interest in the assets of the firm, liable to Richards. Hence, when Richards & Burden agreed to assume all the liability of Taylor for any of the debts or liabilities of the firms of which he had been a member, they assumed no liability to the plaintiff. It is said, however, that both David & Taylor, conveyed and transferred all their assets in the firm, and hence, there were no assets left for the payment of Richards. Whatever interest David & Taylor had in the firm they held subject to the payment of the debts of the firm, including the balance due Richards. They did no more than simply to convey their interests in the assets. These interests passed subject to the charge or claim upon them for the payment of the balance due Richards, so that, after the transfer, as well as before, sufficient assets remained for the payment of Richards, and there was no foundation· for a personal claim against Taylor. Counsel for the plaintiff argue this question as though the agreement of Richards & Burden was to pay *all the. liabilities of the firm of Taylor, Richards & David*, instead of, as it really is, to assume *all the liability of said Taylor, for any of the debts of said firm of Tvylor, Richards & David*. Counsel refer to a subsequent agreement of B. B. Richards and George Burden, dated December 27, 1864, which, in reference to the contract of June 8, 1864, in the preamble says:

"WHEREAS, under said agreements, the said Richards & Burden were to pay and discharge all the debts and liabilities of every kind of the said * * Taylor, Richards & David," and they contend that this is explanatory of the intention of the parties to the contract of June 8, 1864. There is no am-

biguity in that contract; its terms are plain and explicit, and they ought not to be overcome or controlled by a mere recital in a subsequent agreement, to which it may well be supposed the attention of the parties was not so carefully directed.

Counsel also refer to the provision of the contract of May 8, 1860, above set out, and insist that it preserved plaintiff's credits against the firm of Taylor, Richards & David, and that the lands transferred by him to the firm of Taylor, Richards & Burden passed subject to the payment of such credits.

The stipulation in the contract to which counsel refers is as follows: "The credits of the said Richards with the said Taylor, Richards & David, and his interest in any other assets than lands, and his liabilities as a member of such firm of Taylor, Richards & David, not to be affected by this transfer of his interest in said lands." The only effect of this provision is to continue Richards' credit with the firm, and his liability as a member of the firm, after the contract as before.

It is claimed, however, that Richards & Burden have succeeded to all the assets of the firm of Taylor, Richards & David, and that therefore they are under obligation to pay the debts of that firm, including this credit claimed by plaintiff. This involves a consideration of the question whether the firm of Taylor, Richards & David was, in fact, indebted to the plaintiff. As we have before stated, the credits in favor of the respective members of that firm are as follows: J. W. Taylor, $117.02; B. B. Richards, $961.43; E. C. David $1,921.55. These together amount to just $3,000. The firm is therefore indebted to the members of the firm $3,000, each partner's share of this debt is $1,000. So that while the plaintiff has a claim against the firm for $961.43 upon an adjustment of the claims owing by the firm, the firm has a claim against him in the sum of $1,000, which is $3,857 more than the firm owes him. In fact then the firm did not owe the plaintiff, but plaintiff owed the firm. Counsel for the plaintiff concede that this would be the case if the firm was insolvent, but they insist that, if the firm had just $3,000 of assets, enough to pay all its debts, each member of the firm must be paid in full, from which they infer that the firm owes each partner the amount of his claim. Suppose then the firm to owe no claims, except to the individual partners, and to have assets just to the amount of $3,000, each partner's share in these assets is $1,000, and each partner is entitled to have his claim paid. Suppose these assets were equally divided, there would still be a debt of $921.55 due E. C. David, while the plaintiff would be overpaid $38.57, and J. W. Taylor would be overpaid $882.98. It follows that Taylor and the plaintiff must surrender the over-payments to them to make up the deficit in favor of David. Hence the plaintiff must contribute of his share of the assets to pay the debts of the firm; and he would have to contribute just so much, no matter how great the assets of the firm might be. Hence he was in fact indebted to the firm, notwithstanding his credit upon the books. It follows that he is not entitled to payment of this item from the firm of Richards & Burden.

*XIII.  As to the $1,378.55 credited in favor of Taylor, Richards & Burden, on the books of Taylor, Richards & David.*

On the books of Taylor, Richards & David there stands a credit in favor of Taylor, Richards & Burden, and on the ledger of Taylor, Richards & Burden, a debit in the sum of $1,378.55. The defendant, George Burden, claims that he is entitled to a credit against the plaintiff for two-thirds of this amount, with interest from December 31, 1857, the date of the credit upon the books.    The referee disallowed this claim.    See the thirty-seventh finding.    Richards & Burden acquired the assets of the respective members of the firm of Taylor, Richards & David, and took these assets, as we have already seen, subject to the payment of the debts which were charged upon such assets.

Richards & Burden also acquired the assets and succeeded to the property rights of Taylor, Richards & Burden.    So that Richards & Burden, as the successors of Taylor, Richards & David, became liable to pay Richards & Burden, as the successors of Taylor, Richards & Burden, this sum of $1,378.-55.    In other words, Richards & Burden were both creditor and debtor for this amount.    This operated as a cancellation of this claim.    There is no foundation for a claim against plaintiff growing out of this item.

*XIV.  As to whether Richards should reimburse Richards & Burden for paying the Blanchard claim, and if so, in what amount.*

On the first day of September, 1855, the firm of Taylor, Richards & David executed to Ephraim Blanchard a receipt for $1,200, which they agreed to invest in entering U. S. government land on time for settlers, retaining as their commission the profits realized above twenty per cent.

E. C. David, of the firm of Taylor, Richards & David, being in failing circumstances, conveyed, without consideration, his interest in the lands of Taylor, Richards & David, to his brother, William G. David.    At the request of E. C. David, William G. David conveyed E. C. David's interest in the lands of Taylor, Richards & David, to Taylor, Richards & Burden, to secure them for a loan of over $5,000, which was evidenced by a note.    Matters being in this situation, and the Blanchard receipt being outstanding and a claim against the firm of Taylor, Richards & David, on the 21st day of January, 1861, George Burden submitted to E. C. David the following propositions:  "I will give 480 acres of land in Butler county, or in adjacent counties equally satisfactory, to order of E. C. David, and his note for $5,521.20, given to Taylor, Richards & Burden, if he will deliver to me, Wm. G. David and E. C. David's quitclaim to all their interest in lands, notes, accounts and other assets of Taylor, Richards & David, and assign to me E. Blanchard's receipt for $1,200, dated September 1, 1855, and given by Taylor, Richards & David."    E. C. David accepted this proposition. Pursuant to this arrangement the land was deeded, and the receipt was procured by E. C. David, and surrendered.    The land deeded pursuant to this agreement was farm land, of the value of $960.    George Burden insists that the plaintiff should be charged upon the books of the firm with this sum. The plaintiff insists that he should not be charged at all; and, if charged in any sum, that he should not, in any event, be charged with more than half the amount.    The plaintiff insists that this land was given for the quit-claim

of E. C. David's interest in the assets of the firm of Taylor, Richards & David, and that the surrender of the Blanchard receipt was but a mere incident, or, at the most, but a small part of the consideration. The defendant insists that E. C. David had agreed to quit-claim his interest in the assets before, in consideration of the surrender of the note, and that the sole consideration for the conveyance of the 480 acres of land was the surrender of the Blanchard receipt. We do not deem it necessary to determine this question. Burden testified that he negotiated for the surrender of this receipt at the request of the plaintiff, and that the plaintiff agreed to become personally responsible to the firm of Richards & Burden for the amount paid therefor. This the plaintiff positively denied. As the burden of proof is, as to this fact, upon the defendant, we must hold that it is not proven.

The case then became simply the payment by Richards & Burden of a debt owing by the firm of Taylor, Richards & David. This, at the most, only made Richards & Burden a creditor of Taylor, Richards & David.

Richards & Burden, under the contract of May 8, 1860, the above agreement of January 21st, 1861, and the subsequent agreement of June 8, 1864, acquired the assets of the respective partners in the firm of Taylor, Richards & David. These assets, as we have already said, passed burdened with the liability of each partner for the debts of that firm. Richards & Burden having absorbed all the assets of the firm of Taylor, Richards & David, have become, to the extent of the value of these assets, liable for the debts of that firm. And, as it is conceded that Taylor, Richards & David had assets enough to pay all their debts, it follows that Richards & Burden are liable to the payment of this debt to Richards & Burden. This operates as a cancellation of the claim, and, in fact, the plaintiff testifies that it was agreed that this claim should be canceled. The disposition of this question by the referee is contained in the thirty-sixth finding. The referee found that the plaintiff should be charged with $960 January 21, 1861. The court sustains the plaintiff's exception to this finding, and, in this regard, we think the action of the court was correct.

*XV. As to the question of usury between the partners.*

It was agreed in all the firms that each member should furnish all the money he could conveniently, to be invested in time locations, and that he should receive twenty per cent of the profits on the money so furnished, and that the balance of the profits, if any, should belong to the firm and be divided among the members equally. There was no loan to the firm, nor was there any agreement to pay the amount advanced with interest. The parties were engaged in the time entry business, so common in that day, and their agreement was made with the expectation that they would realize at least forty per cent profit upon the money invested. In passing upon the claim of Mr. Burden, we have already indicated our opinion that this arrangement was not usurious. The finding of the court and the referee upon this branch of the case is correct.

*XVI. As to what credit plaintiff is entitled to from Richards & Burden on account of money paid by him for the Evans estate claim.*

In 1861 the plaintiff, with his own money, bought, at a large discount, claims to the amount of about $800, against the estate of John Evans, de-

ceased. Complaint being made of the plaintiff's engaging in speculation outside of the firm, he agreed to call the transaction a firm matter, and turned the claims purchased over to the firm. The firm collected nearly the face of these claims. The plaintiff insists that he should have credit for the amount paid for these claims. The only controversy is as to the amount of credit which plaintiff should receive. The referee found that plaintiff paid $390 for the claims, and credited him with that amount. This action of the referee we approve.

XVII.

The firm of Richards & Burden did a life insurance business, Burden being the active agent, but accounting for the commissions to the firm. He procured a policy of insurance upon his own life, and from 1863 to 1867 paid the premiums out of the commissions earned. In the final decree Burden was charged with these premiums, amounting June 1st, 1876, to $417.21. This was right. Burden had the sole benefit of the insurance, and it ought not to be paid for by the firm.

XVIII. As to whether Richards should be charged with the $500 received by him on sale of the S. W. of S. E. and S. E. of S. W. 30, 95, 9. Also as to whether the credit of $155 to Mrs. Burden on account of said land, appearing on the firm books, is a proper one.

I. On the 6th day of February, 1854, and before the formation of any of the partnerships refered to, B. B. Richards, entered, in his own name, the above named land. On the 4th day of March, 1869, he sold it for $500. Burden claims that Richards should account to the firm for the amount received, with interest. Both the referee and the court below disallowed this claim. In the journal of Taylor, Richards & Burden, under date of April 24, 1858, E. A. Holmes is credited as follows: "S. W. S. E. and S. E. S. W., 30, 95, 9, location with J. W. Taylor, $155." On the opposite side of the journal, Taylor, Richards Burden are charged with $155, but the charge bears date April 20, 1858. The parties are unable to furnish any explanation of these entries, but Burden concludes from them that the land became the land of Taylor, Richards & Burden. Counsel for the defendant say: "We have no doubt that the land above described was entered in the name of Richards for Mrs. Burden, and with a part of the $1,000 received by him on the first of February, 1854. On the 24th of April, 1858, Mrs. Burden was credited with the $155, and the firm took the land." It may be true that the entries are susceptible of explanation upon this theory, but there is no evidence that the facts were such. And, considering the difference in the dates of the credit and debit, in connection with the other evidence in the case, we do not think that this theory must, of necessity, be adopted, nor, indeed, that it should be adopted. On the 2d of March, 1865, Burden charged B. B. Richards, in his private account on the ledger of Richards & Burden, with $40.65, for taxes paid by the firm on this land. This is inconsistent with the position that the land became the property of Richards & Burden in 1858. Besides, B. B. Richards testifies positively that the land was enterd by him, and was always his individual property. It is not incumbent upon us to explain these entries, since the parties who made them have not been able satisfactorily to do so. It is conceded that the land was

orignally entered in the name of Richards, and Burden has not given any intelligible account of the manner in which it became the porperty of the firm. Under the evidence, we think the finding of the referee and of the court cannot be disturbed.

II. The referee included the above credit of $155 in Mrs. Burden's account against the firm. The court caused this item to be stricken from her account. This credit, as we have seen, bears date April 24, 1858. As we understand the referee's report this, sum is included in the general balance of $10.320.47, carried to the credit of Mrs. Burden on the first day of January, 1859, and treated as account stated. It cannot be stricken from Mrs. Burden's account unless it is made satisfactorily to appear that it was entered up to her credit through mistake. The evidence does not satisfy us that any such mistake was made. We think the referee properly allows this item to remain to Mrs. Burden's credit.

*XIX. As to whether Burden should account to the firm for the profits made by him on the SE. qr. of 14, 98; 11, Howard county.*

Before coming to Iowa, the defendant, Geo. Burden, was a member of the firms of Burden, Woodruff & Co., and Burden, Baggage Co. One Samuel Fellows owed these firms $345.41, which claim became the property of A. A Woodruff. In June, 1860, Woodruff sent this claim to Burden for collection. In 1863 Burden took from Fellows a tax certificate on the above land in part payment of said debt. On the 19th of June, 1847, Burden bought the title of the original owner of said land, paying therefor, out of the firm funds, with which he was charged, $450. In May, 1877, Burden settled this claim with Woodruff for $75. November 12, 1868, Burden sold the land for $1,600. The testimony shows that there was an express agreement between Richards & Burden, that neither should do any business properly belonging to the firm, such as buying or selling lands, for his individual interest. The court, in an interlocutory decree, ordered that Burden be charged with the profits realized upon the sale of this land, and that the referee take an account of, and credit him with, his expenses respecting them. Pursuant to this decree the referee took an account of expenses and charged the defendant with $1,506.30, January 1, 1878. We have carefully examined all the evidence upon this question, and we think the action thereon is correct.

*XX. As to whether Burden should be charged with Mitchell county orders.*

The books of Richards & Burden show that they bought Mitchell county orders of the amount, including interest, of $1,426.03. The books show of this amount $646.81, in the hands of Roziene & Frisbie. The evidence shows that $684.07 were sent to J. H. Brush, leaving $95.15 unaccounted for. The plaintiff testified: "So far as I know, Mr. Burden took all of these orders, and he should account for the balance and accumulated interest." Mr. Burden admits that he used $60.07 of these orders in paying taxes upon the Mitchell county lands, with which he should be charged at their market value of seventy-five cents on the dollar, if he is found to be the owner of the Mitchell county lands. He denies that he used any of the orders, or that he should be charged therefor, other than as above stated. The court in the interlocutory decree ordered that Burden be charged with the full amount of these orders. Pursuant to this decree, the

referee found that Burden should be charged with $95.15, of the date of March 5, 1869. The only ground upon which this decree can be supported is that Burden was the book-keeper of the firm, and the orders are not accounted for. The orders were as much under the control of Richards as of Burden The evidence shows that Richards sent the $684.07 to Brush. The mere fact that the orders are not accounted for does not justify the charging of them to Burden. The defendant admits that he used $60.07 of these orders in paying taxes, for the year 1869, on the Mitchell county lands. As the defendant was in the final account credited with all the taxes paid upon these lands, he should account, at their face value, for these warrants as of the date of the payment of the taxes of 1869, February 28, 1870. The defendant should be charged with $60.07, with interest from February 28, 1870.

*XXI. As to what Burden should be charged for. the Chickasaw bonds or orders.*

The firm of Richards & Burden had certain bonds, or volunteer orders, of Chickasaw county. The plaintiff claims that of these $254.37 are unaccounted for, and that Burden should be charged with the whole amount and interest. Burden concedes that he used of these $135.47, in payment of taxes on the Chickasaw county lands, and that he should be charged with this with interest from March 5, 1869, if he is allowed to hold the Chickasaw county lands. Under the interlocutory decree, Burden was charged with the whole $254.37. There is no evidence that Burden used any of these orders except as above admitted. Burden has been credited with all the taxes paid upon the Chickasaw county lands, and hence should be charged with $135,-47, with interest from March 5, 1869.

*XXII. As to the amount with which plaintiff should be charged for the Dubuque county warrants; also, as to whether any charge should be made on account of said warrants against George Burden.*

1. The books of the firm show that on June 5th, 1869, they had on hand $1,098.12, of Dubuque county warrants. The plaintiff admits that on June 3, 1869, the defendant handed him $493.69 of these warrants, with a small amount of interest thereon, which he sold at par and appropriated, with the exception of $77.13, used in paying taxes for the firm. On account of these warrants, the referee charged the plaintiff, as of June 5, 1869, with $402.64. This action, we think, is correct.

II. The evidence shows that these warrants were all, June 5, 1869, in the custody of George Burden. The balance of the warrants have not in any manner been accounted for. The court in the interlocutory decree ordered that Burden be charged with all these orders. Under the evidence we think he was properly so charged. Pursuant to this decree the referee charged Burden, as of June 5, 1869, with $491.11. We do not understand the plaintiff to make any objection to the manner in which the referee made up the account so as to reach this sum, but simply to insist that the charge, as made, pursuant to the interlocutory decree, should be retained. We think Burden was properly charged with this amount.

*XXIII.   As to what Mr. Burden should be charged for Dubuque county bonds, which he took of the firm.*

At the time Burden took into his possession the assets of the firm in April, 1869, he took thirty-five Dubuque county bonds, of $100 each, on one of which $22 had been paid.   These bonds bore interest at six per cent, and, at the time they were taken were worth seventy-eight cents on the dollar. Burden admits that he should be charged with these bonds at the rate of seventy-eight cents on the dollar.   The plaintiff claims that Burden should be charged the full face value of the bonds.   The referee charged Burden with the bonds at seventy-eight cents on the dollar.   The court ordered that he be charged the full value of the bonds.   The evidence shows that the bonds gradually appreciated in value from the time they were appropriated, and that, at the time the testimony in this case was taken, they were, and for some time had been, at par.   Burden ought not to be allowed to profit out of this transaction, but he should account for what he realized from a sale of the bonds which he sold, and for the value of those which he retained. Burden testified that he sold six of these bonds in 1869, for eighty cents on the dollar, and that two were paid by the county, February 11, 1873, at the rate of ninety-five cents on the dollar.   On the 24th of January, 1874, Burden testified that he still had in his possession $2,478 of these bonds, on their face, not reckoning interest.   The testimony does not fix the time of the sale of the six bonds in 1869.   It is fair to assume the middle of the year as the date of the sale.   We think Burden should be charged with six bonds at eighty cents on the dollar, with interest from July 1st, 1869, at seven per cent., with two bonds at ninety-five cents with interest from February 11, 1873, at seven per cent.   The interest is placed at seven per cent because there was a written agreement between the parties that their respective accounts should bear interest at seven per cent.   On the remainder of the bonds the defendant must be charged their par value, less $22, with interest at six per cent from October 1, 1863, which, under the findings of the referee, we assume to be the date when the coupons were payable.

*XXIV.   As to amount of rent Richards should pay for house on Bluff street.*

Richards occupied the "Attix House" on Bluff street, owned by the firm. It is conceded that he is chargeable with rent, the only question being at what rate and for what time.   The referee found that Richards should pay at the rate $300 per annum, from April 1, 1859, to November 1, 1865, when the parties opened their joint house account, and from June 1, 1866, when such account ceased, to May 1, 1868, when he found plaintiff's liability terminated.   The court approved this finding, and, from an examination of all the evidence bearing on the question, we think the finding correct.

*XXV.*

During the existence of the partnership Richards, was in the legislature four sessions.   It is insisted that he should account for his per diem for these sessions.   The evidence shows that he did allow $110 of his compensation to be used for house expenses during the spring of 1866.   The evidence tends to show that this $110 was all that Richards saved out of his compen-

sation as a member of the legislature, and that in the session of 1868 he spent more than he received. The referee and the court below correctly disallowed this claim.

*XXVI. As to what Burden should be reimbursed on account of Wm. Burden, Sr.*

On the books of Richards & Burden, William Burden, Sr., is debited with $225.95. The plaintiff claims that George Burden advanced this sum for his own convenience, that it was not a partnership transaction, and that George Burden should account to the firm for that amount.

Upon the contrary it appears that on the books of Taylor, Richards & Burden there was a credit in favor of William Burden, Sr., for $435.87. Burden claims that the debit of $225.95 was a payment of this credit, and that he paid the balance due William Burden, Sr., and should have a credit therefor. On account of this claim the referee and the court allowed the defendant, George Burden, a credit, as of date of payment, July 1, 1867 for $338. From an examination of all the evidence we think defendant is entitled to the balance between the credit, $435.87, and the debit, $225.95, with interest from January 1, 1859, to July 1, 1866, at six per cent. After the date of payment, the amount paid became a credit due George Burden, and under the agreement between himself and Richards he is entitled to seven per cent interest thereon.

*XXVII. As to whether Mrs. Burden is liable on the Susan Burden account.*

On the ledger of Richards & Burden are debit items, in the handwriting of George Burden, against Susan Burden, amounting to $128. Susan Burden is the wife of William Burden, Jr., and sister-in-law of George Burden. The plaintiff testifies that in the usual course of business with the firm he knows of no transactions with Susan Burden; and that these items of cash were advanced to her by George Burden for his own convenience, without the knowledge or consent of plaintiff. George Burden testifies that the balance of $128, against Susan Burden, is made up of sundry cash items, but he does not testify that they were advanced in the prosecution of the ordinary partnership business, or that they grew out of a firm transaction. He simply says that he should not be charged with these items, and that they are incorporated into the account against William Burden, Jr., and embraced in the balance of $244.19 against him. We think from all the evidence that this account was not incorporated into the balance against William Burden, Jr. The referee charged the defendant with the various items of this account, with interest at seven per cent., amounting, June 1, 1876, to $200.64. This action of the referee we approve.

*XXVIII. As to whether Burden should be charged anything, and if so, what, on account of the Belcher mortgage, and Baird lot matter.*

This matter is, under the evidence, exceedingly complicated. It is very difficult to reach a conclusion which is satisfactory. So far as we can gather the facts from the indefinite and unsatisfactory evidence, they are as follows: Belcher & Chapman were doing business in making soda water and, in 1857, they executed a mortgage upon certain property connected with the soda

business, to Taylor, Richards & Burden, to secure the sum of $650. Afterward J. W. Ware, a brother-in-law of George Burden, became connected with, Belcher & Chapman, and they executed a mortgage to George Burden for the expressed consideration of $3,406, on everything connected with the soda water business, including the property before mortgaged to Taylor, Richards & Burden. The plaintiff asserts another claim of $800 was secured by a mortgage upon the property connected with the soda water business, to Taylor, Richards & Burden; also, that another note of $114.75 was secured by the mortgage first named. Through the procurement of George Burden, Belcher, Chapman & Ware sold out their property mortgaged as aforesaid, to one W. R. Baird, who executed a mortgage direct to George Burden upon lots 6, 7, and 8 in Baird's addition, subject to a mortgage of $500 to one Cain, to secure the purchase money. Burden afterward disposed of the mortgaged property. The plaintiff claims as a result of this transaction, first, that Burden, having realized the value of the mortgaged property, must account for sufficient to satisfy the prior incumbrance to Taylor, Richards & Burden, and that he has not done so; second, that Burden made a profit out of the sale of the Baird lots and must account to the firm therefor. The referee originally disallowed both claims. Under the interlocutory decree, the referee charged the defendant with two items, one of $114.75, and one of $51.16, amounting June 1, 1876, to $376.21, as due Taylor, Richards & Burden, on the prior mortgage, and not paid. Entries upon the ledger of Richards & Burden, in the hand writing or Burden, seem to us to justify this charge.

As to the profits upon the sale of the Baird lots, Burden testifies that he made none, and we cannot find from the evidence that he did. As to this branch of the case we approve the action of the court and of the referee.

*XXIX. As to whether the McVey purchase is a firm transaction.*

Richards & Burden were agents for the sale of 320 acres of land belonging to the McVey estate, the lands having been put into their hands by Cook & Welling, of Des Moines. They negotiated a sale of these lands, which failed. because of a defect in the title. Richards & Burden themselves made an offer for the lands which was not accepted. For nearly a year the matter rested without any correspondence between the parties, until just prior to the commencement of this suit, when Cook wrote a letter to plaintiff asking him to renew his efforts to sell the land. On the 15th of September, 1869, three days before the commencement of this suit, the plaintiff wrote Cook & Welling informing them that he and Burden would do no more business together, and asking that any further correspondence be directed to him individually.

October 4, 1869, Richards reported an offer for the land, six dollars per acre, which was accepted on the 16th. On the 28th of the same month Richards reported that, because of defect as to title, the party was disposed to back out, and that, if he did, he, Richards, would himself take the land. On December 8, 1869, the land was deeded to Richards. The defendant insists that the transaction should be treated as a purchase on behalf of the firm, and that Richards should account to the firm for the profits thereof.

The referee and the court disallowed the claim, and, from a consideration of all the evidence, we think their action is right.

*XXX. As to the charge to be made on account of firm land in Butler county, appropriated respectively by plaintiff and the defendant, George Burden.*

The plaintiff, on the twelfth day of April, 1865, by consent of the defendant, George Burden, appropriated to his own uses 242.26 acres of land in Butler county, which was entered to the debit of plaintiff, but the price was not extended.

On the twenty-fourth of February, 1866, Mr. Burden, by consent, appropriated to his own use 160 acres of land in Butler county which was entered to his debit, but the price was not extended. The plaintiff claims that the agreement was that each party should be charged what the lands were fairly worth.

The defendant, Burden, claims that it was agreed that 160 acres of land taken by plaintiff should be offset with the 160 acres taken by Burden, without regard to value, and that plaintiff should be charged with value of the remaining 82.26 acres. The referee found the agreement to be as claimed by the plaintiff, and charged plaintiff $2 per acre, April 12, 1865, and the defendant $4.50 per acre, February 24, 1866.

The agreement, as claimed by plaintiff, is in accordance with what would be regarded as reasonable, in a business transaction, and is just what the law would imply in the absence of any agreement. The burden of establishing an agreement such as the defendant claims, exceptional in its character, and such as will not be inferred, is upon the defendant. We think the evidence supports the finding of the referee, or at least that the defendant has not established by a preponderance of testimony the agreement by him claimed.

*XXXI. As to whether plaintiff should be charged with the balance due Richards & Burden from Mrs. Hervey.*

The defendant, Burden, testifies that plaintiff should be charged with all accounts due from his sister, Mrs. Hervey, because all money was advanced, and all indebtedness was incurred, upon the agreement of plaintiff to see it paid.

The plaintiff positively denies that he ever made such agreement. The burden of proof is upon the defendant. He fails to establish his claim by a preponderance of testimony.

*XXXII. As to whether the plaintiff should be disallowed interest on certain erroneous credits.*

Certain erroneous credits appear on the books in favor of plaintiff, amounting to $1,006.75. In 1863 these credits were charged back to the plaintiff. To the end that plaintiff might not be allowed interest on these items, the referee in making up the account omitted both the credits and debits. This is as the defendant insists the account should be stated, and of this the plaintiff makes no complaint.

*XXXIII. As to the amount of the account of R. A. Babbage against Richards & Burden assigned to George Burden.*

R. A. Babbage assigned to the defendant, George Burden, his credit standing on the books of Richards & Burden. The only question of controversy growing out of this item is as to whether Babbage, at the time of this assign-

ment, was in fact a creditor of the firm of Richards & Burden. The referee found that he was, and that, on account thereof, there should be credited to George Burden, as of October 1, 1870, $326.22. This finding was approved by the court below. The evidence is conflicting, and leaves this question somewhat in doubt. We have concluded, after a careful examination of all the evidence bearing upon this question, that the finding of the referee thereon should not be disturbed.

*XXXIV. As to the ownership and amount of the balance due from Richards & Burden to Burden, Babbage & Co.*

The defendant, George Burden, claims that he is the owner of the balance due Burden, Babbage & Co., from the firm of Richards & Burden. We think the evidence supports this claim.

The referee found there was due George Burden, on December 12, 1868, on account of this claim, $2,092.04. The only item entering into this account, about which there is any dispute, is as to the value of a house and lot conveyed by Burden, Babbage & Co., in settlement of a debt due from Taylor, Richards & Burden to the estate of J. J. Duvitt. The referee found the value of this house and lot to be $400. A preponderance of the evidence, in our opinion, supports this finding.

*XXXV. As to what amount should be charged Burden on account of money drawn by him from firm deposits at Merchants' National Bank.*

Richards & Burden, in their account with the Merchants' National Bank, had a balance to their credit, in August, 1869, of $901.76. The plaintiff testifies that George Burden drew out all of this sum. The checks drawn upon this sum are as follows: $126, $2.25, $150, $300, $3.50, and $320, amounting to $901.75. The defendant admits that he drew the $150 and the $300, and likely the $320. He will not deny that he drew the other sums. He concedes that he is properly chargeable with the $150. He claims that he used the $300 in paying taxes upon the lands of the firm in Winona. But we think from all the evidence that, if he did, the amount was afterward refunded to him by the receiver. He further claims that the $320 is included in a charge to him on the firm books of $333.75. We cannot find from the evidence that such is the fact. He further claims that he did not use any of the money for his personal benefit. If he did not, it is probable that he has credit for all the sums on the firm books.

The referee charged the defendant with the whole of this sum. We find nothing in the evidence which justifies us in disturbing this finding.

*XXXVI. As to the interest chargeable on the proceeds of the sale to Babbage.*

On the 23rd day of July, 1869, the defendant, George Burden, conveyed a large quantity of firm land, the title to which was in his own name, to his brother-in-law, Richard Babbage, for the consideration of $17,936.58, and received therefor a check for $936.58 and two notes, one for $8,000, payable in one year, and one for $9,000, payable in two years, both drawing interest at the rate of ten per cent.

On the 25th day of July, 1871, the plaintiff testified as follows: "As I do not wish to delay the settlement of this case, though I believe the same to be

fraudulent, I elect as an alternative, better than delay or uncertainty, to affirm that sale, and hold defendant, George Burden, responsible for the purchase price of that property, about $18,000, and ten per cent interest thereon in accordance with the terms of sale.'' The referee found that the sale was fraudulent, but that, as the plaintiff had ratified the sale, Burden should be charged with the consideration received, $17,936.58, with interest at seven per cent from July 23, 1869.

The court modified this finding, so far as to charge the defendant with interest at the rate of ten per cent on each of the notes until they mature. The correctness of this modification is the only question which is presented on this branch of the case.

We think, though not without doubt, that this action of the court was correct. As the sale was fraudulent on the part of Burden, he ought not to be allowed to derive any advantage therefrom, at the expense of his copartner, the plaintiff. Both notes were due at the time the plaintiff elected to affirm the sale. Burden testifies that Richard Babbage was solvent. In legal contemplation, then, Burden received the amounts of these notes with interest, at maturity, and for that sum it is proper that he should account to the firm.

*XXXVII. As to the note for $460.30, and the amount due Mrs. Burden thereon.*

Mrs. Burden held the note of Richards & Burden for $460.30, of date January 8, 1863, bearing interest at ten per cent. This note amounted, July 1, 1871, to $1,080.81, with which amount the referee credited her as of that date. The plaintiff testified that Mrs. Burden should receive credit for this note and interest.

On the 1st of April, 1869, the defendant George Burden, took from the firm safe a large amount of notes and turned them over to Mrs. Burden, to be applied toward the satisfaction of her claim against the firm. On these notes Mrs. Burden collected a little less than $12,000, with all of which as of date of collection, she is charged by the referee. It is now insisted, on behalf of plaintiff, that the first money collected upon these notes should be applied in satisfaction of the above mentioned note, rather than upon the open account which bears, as we have seen, but six per cent interest. We are of opinion, however, that equity and exact justice between these parties requires that the collections should be applied to the account which is of much older date than the note.

It is probable that the plaintiff would have been entitled to direct the application of a part of these proceeds to the payment of this note, if he had done so seasonably. But it does not appear that he ever did so until the argument of the case. When his testimony was taken he stated that Mrs. Burden should have credit for the amount of the note and interest, which must be regarded as an assent that the collections referred to should be applied otherwise than upon the note.

*XXXVIII. As to an erroneous charge to Mrs. Burden of $600, in her account with the firm.*

It is conceded that this charge was erroneous. The referee rejected it in making up the final account.

*XXXIX.  As to sale of safe to plaintiff.*

The safe of the firm of Richards & Burden was sold to plaintiff, Dec. 15, 1871, for $345. It is conceded that the plaintiff was properly charged with the amount.

*XL.  As to money expended by Mr. Burden to perfect title to SE. of NW., 6, 96, 20.*

The court and the referee allowed the defendant, George Burden, what he claimed as to this item, and with this action the plaintiff is content.

*XLI.  As to whether George Burden should be credited, in his account with Richards & Burden, with various sums not entered on the firm books.*

George Burden claims that he should have credit with various sums not entered on the firm books. The referee allowed all these items except one of $300. The court struck out of the credit to Burden and the debit to Richards, another item of $50. These two items constitute the only grounds of dispute on this branch of the case.

1. The item of $300 is cash paid for taxes in Winona. We have determined in division XXV of this opinion that this $300 was refunded to Burden by the receiver. It follows that he should not have credit for that sum.

2. The evidence shows that the $50 item was paid by Burden, in 1872, to perfect the title to a part of the land which he sold to Richard Babbage in July, 1869. For this reason it was stricken out of the defendant's account.

It is claimed by the defendant that the land, for the perfection of the title to which the $50 was paid, was acquired from Richards under the contract of May 8, 1850, and that he was under obligation, under the contract, to make good the title. We are unable to find, from the evidence referred to by the defendant, that the land was embraced in this contract. We think the action of the court upon this branch of the case is correct.

*XLII.  As to moneys paid by Burden for taxes and tax certificates on certain lands in Cerro Gordo county.*

The referee and the court below allowed Burden all he claimed under this head, $688.35, as of July 1, 1876. Of this the plaintiff does not complain.

*XLIII.  As to block 9, Hamilton's addition, and Grout House in Winona, Minnesota.*

The firm of Richards & Burden sold block 9, Hamilton's addition to Winona, and the Grout House in the same town, and received the proceeds of the sales. At the time of the sales Burden individually owned one third of the Grout House and one fifth of block 9. For these interests he was credited by the court below, as of Jan. 1, 1878, with $908.39. This action is satisfactory to both parties.

*XLIV.  As to the notes turned out by Mr. Burden to Mrs. Burden, and by her, during the progress of the suit, returned to the receiver.*

On the 25th day of May, 1869, the defendant, George Burden, assuming to act on behalf of the firm of Richards & Burden, entered into a settlement with Mrs. Burden, and evidenced it by a written agreement. In this agreement it was stipulated that, after deducting from the credits of Mrs. Burden

the sum of $9,250.38, on account of the interest agreed to be conveyed to her in the Chickasaw and Mitchell county lands, there remained due her the sum of $38,347.49. For this sum he executed in the firm name three promisory notes, each for the sum of $12,782.49, due in thirty, sixty, and ninety days, with interest at six per cent. In part payment of the sum acknowledged to be due to Mrs. Burden, Mr. Burden turned over to her a large amount of firm notes. On these Mrs. Burden collected a little less than $12,000, and she was properly charged with the sum collected in stating the account by the referee. On the 15th day of January, 1874, Mrs. Burden filed a supplemental answer and cross bill, in which she states that all the notes and bills receivable turned out to her, and uncollected, have been delivered to the receiver, and asks that the amount due her before said notes and bills receivable were turned out to her may be ascertained.

With reference to this branch of the case, the referee found as follows: "This was no settlement. It was a grand '*coup*,' was unauthorized, without the knowledge or approval of plaintiff, and all this was well known to defendant, E. A. Burden. It was made when both defendants knew that the amount due her was in dispute, and was made on a basis which both defendants knew was not, and would not, be approved by plaintiff.

"Defendant, E. Burden must be charged with all moneys paid to her on such notes. Pending this action she has, by pleadings filed, accounted for all collections made on such notes, and turned over the balance to the receiver of the firm." The defendants now claim nothing under the settlement. Mrs. Burden was permitted to return to the receiver the uncollected notes, and she was finally charged with only amounts collected. Of this the plaintiff complains. The plaintiff insists that the defendants should be charged, as for a conversion, with the face value of all the notes originally turned out to Mrs. Burden. This action was commenced on the 18th day of September, 1869. In the petition then filed the plaintiff alleges that the defendant, George Burden, has delivered the firm property to the defendant, Eliza A. Burden, and asks that she be compelled to account for the firm property in her hands; that a receiver be appointed; and that the defendants be enjoined from interfering with, or disposing of any of, the partnership property under their control, and that they be compelled to surrender the same to the receiver. Pursuant to this petition, on the 18th day of September, 1869, a receiver was appointed and an injunction was granted as prayed. The defendants filed a motion to dissolve this injunction, which the court on the 4th day of January, 1873, overruled. The plaintiff might, perhaps, have proceeded against the defendants for a conversion of these notes. But it is evident from the petition, and from the procuring of an injunction restraining the defendants from disposing of this property, that he elected still to treat the property as firm property, and to pursue the property itself. In view of the claim made in the petition, and of the fact that the evidence does not show a depreciation of this property in consequence of its being in the hands of the defendants, we think there was no error in permitting a return of this property to the receiver.

*XLV. As to the Mitchell and Chickasaw county lands sold by Burden.*

The defendant, George Burden, sold a quantity of the land in Mitchell and Chickasaw counties, embraced in the contract of January 9, 1869, which we

hold cannot be enforced. The referee charged Burden with the sum for which each piece of land sold, with interest thereon at seven per cent from the date of the sale. The court, in the interlocutory decree ordered that Burden be charged with all moneys received on these sales, and that he turn over to the receiver all notes, evidences of indebtedness, contracts, or mortgages in his posession.

The defendant took notes and securities upon the sales made, drawing ten per cent interest. The effect of the decree of the court is to allow the firm the benefit of this interest, instead of simply seven per cent upon the amount of the sales. We think the action of the court in this regard is correct.

*XLVI. As to costs of suit, Griffith v. Richards & Burden.*

J. M. Griffith deposited with the firm of Richards & Burden, to be sold or accounted for, one Minnesota State bond, and obtained the receipt of the firm therefor. When Burden removed the firm assets in April, 1869, he took the bond. Griffith not being able to obtain the bond, sued Richards & Burden therefor, and recovered judgment. The costs of this suit were paid by the receiver, and the court directed in the interlocutory decree, that they be charged to the defendant, George Burden. Accordingly the referee reported the costs in that suit at $37.65, amounting June 1, 1876, to $46.86, with which Burden was charged. These costs were all incurred through the individual act of Burden in taking this bond into his custody and refusing to surrender it. We think he was properly charged with the costs of the suit rendered necessary by his wrongful act.

We have gone over this entire case and considered all the points discussed by counsel. In all respects, except as indicated in the foregoing opinion, the action of the referee, and of the court is approved and affirmed. Our determination, allowing the plaintiff a credit for the uncles and aunts accounts, reducing the credit to which the plaintiff is entitled for household expenses, and reducing the interest to be allowed Mrs. Burden on her account, necessitates an entire restatement of the account.

The cause is again referred to D. C. Cram, Esq., to state the account between the parties in accord with the views of this opinion, and make report of his action to this court. Upon the filing of the referee's report, final decree will be entered in this court. Or the parties, if they so elect, may have the cause remanded to the court below for the appointment of a referee, statement of account, and final decree. The costs of this court will be taxed, one half to the plaintiff and one half to the defendants.

MODIFIED AND AFFIRMED.

Adams, J., having been of counsel, took no part in the determination of this case.

ON REHEARING.

SEEVERS, CH. J.—Upon the petition of the defendant, a rehearing was granted as to several paragraphs contained in the foregoing opinion. As to all of which, except the seventh, the opinion is in all respect adhered to. The questions determined involve propositions of fact only, therefore a more extended discussion of the evidence is deemed unnecessary. As to the seventh paragraph, the court is equally divided. This result is caused by the fact

that Adams J. has been of counsel, and therefore takes no part in the case. The question now arises, what further order can or should be made. This proposition has been fully argued by counsel, and, in relation thereto, we desire to say: Under the statute, a petition for a rehearing may be filed which stands as the argument in its support. If the court think such argument requires a reply it shall so indicate to the other party and he may reply thereto, within such time as the court may allow. The decision may be suspended until the questions presented in the petition for a rehearing are determined. Code, section 3201, 3202. The rules of this court require the petition to be ·filed within sixty days after the decision. During such time this court retains jurisdiction of the case for all the purposes of a rehearing as though no opinion had been filed. *Mc Kinley v. C. & N. W. R. R. Co.*, 44 Iowa, 314.

When a reply is ordered the court has of course determined to re-consider the questions as to which a rehearing is asked. In the present case, as no question of law is involved, the court again in the light of the additional arguments has examined the evidence as an original question. The opinion heretofore filed having no effect as to the determination to be made. When the petition was presented, a rehearing was in fact ordered. But this is not regarded as material, for in such a case, or when a reply is directed to be made, the result is the same, and that is, a retrial or reconsideration of the matters as to which a rehearing is asked is the essential thing the court is called on to do. Such reconsideration of the evidence bearing on the question determined in the seventh paragraph of the foregoing opinion has been made and, two members of the court adhere thereto, and an equal number say the conclusion reached is not in accord with the evidence. If this result had been reached when the case was first before the court, the judgment of the District Court would have been affirmed by operation of law. Code, section 140. As the court is unable upon a reconsideration of the evidence, which is enjoined by law, to say whether the foregoing opinion is right or wrong, the result is, and must be, that it does not now embody the views of a majority of the court. That it did so at one time must be conceded, but this is immaterial, because what is the final decisions of the court can only be known after the final submission of the cause, and after the decision has been made upon such submission. The final submission known to the law of this State is that upon rehearing, when the submission is made, the pivotal question is not what has been theretofore decided, but what decision shall be made.

Suppose that upon a rehearing of an opinion reversing the judgment of the court below in an action at law, this court should be equally divided in opinion. If this division should result in an adherence to the original opinion, and a remanding of the cause, the court below might adhere to its original view, which, upon appeal, would be affirmed by a divided court, so that the same judgment would be both reversed and affirmed. The same result would follow under the same circumstances in an equity case. This being so, it seems to us a different rule than the one adopted would lead to absurd results. It can make no difference where the final decree is entered in an equity cause. The rule should be the same whether entered in this or the court below.

We are therefore of opinion that the seventh paragraph of the foregoing

opinion must be stricken out, because it does not embody the views of a majority of the court. The result is, the judgment of the District Court in relation to the subject matter thereof must stand affirmed by operation of law. As the defendant consents thereto, the tenth paragraph of the foregoing opinion will also be stricken out, and the judgment of the District Court in relation to the subject matter thereof will be affirmed, unless the plaintiff objects thereto. A decree will be prepared in accordance with this opinion.

BECK, J., *Dissenting.*—I. This case was tried before four justices of this court, one, Mr. Justice Adams, having been of counsel in the court below, has taken no part in its consideration and decision. The four justices concurred in an opinion announcing a decision which modified the judgment of the court below. A rehearing was allowed and the case was reargued. There was no order suspending the judgment. This, it is presumed, was not considered necessary, as the decision required the preparation of a decree, and the cause was sent back to the same referee who first heard the case. Upon the rehearing two of the justices adhere to the opinion filed, and two think that it ought to be modified as to one or two items allowed to plaintiff by the opinion. It thus happens that the justices qualified to act in the case are, upon the rehearing, equally divided in opinion upon these items. It should be noted that the petition for rehearing does not complain of all the conclusions in the opinion, but only of those upon a few points, and a rehearing is asked upon no other points of the case. We are to determine what is the effect of an equal division in the opinion of the judges upon the disputed points which were reargued.

II. The filing of the opinion was the announcement of the decision of the court. Code, section 3205. The case was then decided. The points determined were expressed in the opinion. The decree is the expression of the decision in another form. I conclude that there was a decision in the case at the time the petition of rehearing was filed.

III. The granting of the rehearing did not vacate, annul, or set aside the decision made when the petition was filed. The statute provides that upon the filing of the petition for rehearing the decision shall be suspended upon the order of the court, or one of the judges. Code, § 3201.

We must inquire what is meant by the term "to suspend" the decision. It does not mean to annul, set aside or vacate—to suspend means, "to cause to cease for a time, to hinder from proceeding, to interrupt, to delay, to stay." Webster. It is used in this sense in the statute, which expresses the thought that the operation of the decision is delayed. Section 3202 provides that "with a view to a rehearing, the court may extend the suspension of proceedings, yet farther if need be." The "suspension of proceedings" here provided for is the delay or stay thereof. This suspension is ordered "with a view to a rehearing."

The word "view" in this connection means "that which is looked toward, or kept in sight, as object, aim, intention, purpose, design." Webster. The clause of the section just quoted therefore means "for the purpose of rehearing, the operation of the judgment is delayed."

Now the setting aside or vacating of the decision is not provided for or contemplated when a rehearing is granted; the statute provides for "suspen-

sion of proceedings," that is, delay of operation of the decision. This is the plain and undisputed meaning of the statute, and *there is no provision found anywhere authorizing or permitting the court to set aside the decision when a rehearing is allowed.*

I have considered what the court may do by proper order, but in this case it has made no such order. But upon that fact I place no reliance, and I may concede that whatever the court could have done was done, namely, the operation of the decision was suspended pending the rehearing.

IV. When the rehearing is allowed the court is required to determine whether the opinion will be adhered to, or whether a different decision will be announced in a new opinion, which will operate to set aside the first decision. This of course involves a reconsideration of the whole case. Upon the granting of the rehearing, we were required, then, to determine whether the decision should be set aside and a different decision rendered. I have, I think, showed clearly that the granting of the rehearing did not set aside the decision. Until set aside that decision must stand. To set aside the decision, a majority of the justices must concur, just as in all other orders and decisions. If the judges authorized to act are equally divided, the decision must stand. I can discover no way of escape from this conclusion.

V. The foregoing views are in accord with our uniform practice. We never enter new judgments in rehearings when the opinions are adhered to; our order is simply, "The opinion is adhered to."

If the decision is set aside by the granting of a rehearing, of course a new judgment would be entered. We have then the case of a subsisting valid decision; an equal division of the opinions of the judges cannot set it aside.

VI. But, it may be asked, when will the suspension of the operation of the decision terminate. I reply when the proceeding upon rehearing terminates. This proceeding terminates when the court reaches the conclusion that the decision cannot be set aside. This decision is reached when it is discovered that a majority of the court does not concur therein. So when we discover that the judges are equally divided upon the questions submitted on the rehearing, the suspension of the decision is removed and the decision stands and must be enforced.

VII. Consideration of the argument presented in the last paragraph but one of the foregoing opinion, based upon the case of an equal division of the judges of this court in a law action, is demanded for the reason that it has a controlling influence upon the mind of at least one of my brothers. The argument supposes a case of an equal division of opinion upon a rehearing in a law case, which results in reversing or remanding a case. · It is said the court below *"might* adhere to its original view." I would change the expression and say the court below *"ought* to adhere to its original view, unless new light was shed upon the case by the new trial." The equal division in this court, in the supposed case, takes from the decision all authority as a precedent. The judgment of reversal would require a new trial, but the decision of the courts being based upon an equal division could be no guide to the court below, which would be left free to select its own course. Upon another appeal in the case, if the court remained equally divided, the judgment of the court below would be affirmed.

The opinion of the majority contains the statement that in this court "the

same judgment would be both reversed and affirmed." It cannot be true that the same judgment can be twice appealed from, or can be both reversed and affirmed in this court. The first judgment being reversed was set aside and ceased to be of force. Thereupon the cause was remanded and another trial was had, and *another* judgment was rendered, which, in its turn, was appealed from and was here affirmed. So it is impossible that the "same judgment would be both reversed and affirmed. It is true that in the same case there were two successive judgments rendered by the court below, one of them was reversed, and the other affirmed, in .this court, a thing of not unusual occurrence. This result, to my mind gives no suppport to the position that this court, upon an equal division in the opinion of the judges, may set aside a decision rendered by the unanimous concurrence of all the judges qualified to sit in the case. I fail to discover any "absurd results in the supposed case which is made the foundation of an argument of controlling weight with the majority of the court. The way of difficulty and obscurity, it seems to me, has been chosen in the foregoing opinion of the majority. If we should decline to set aside a decision of this court, except upon the concurring opinion of a majority of the judges qualified to sit in this case, one road to such a conclusion would be to my mind plain and clear. I prefer to pursue it and therefore dissent from the foregoing opinion of the majority.